## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**SHAMIEKE PUGH, et al.,**

        **Plaintiffs,**

                                **Case No. 1:19-cv-245**

      **v.**                        **JUDGE DOUGLAS R. COLE**

**RONALD ERDOS, et al.,**

        **Defendants.**

### OPINION AND ORDER

This matter comes before the Court on Defendants' Motion for Judgment on the Pleadings (Doc. 11) and Plaintiffs' Motion for Leave to File an Amended Complaint (Doc. 19). For the following reasons, the Court **GRANTS** Defendants' Motion and **GRANTS** Plaintiffs' Motion.

### BACKGROUND

For present purposes, the Court accepts as true the facts set forth in Plaintiffs' Complaint. (*See* Compl., Doc. 1, #1–29[1]). Plaintiff Shamieke D. Pugh ("Pugh") was formerly incarcerated at Southern Ohio Correctional Facility ("SOCF") at all times relevant to this matter, but was released on December 27, 2018. At the time this suit was filed, he resided in Delaware County, Ohio. (*Id.* at ¶ 5, #3–4). Plaintiff Maurice D. Lee ("Lee") was also housed at SOCF during the relevant time period. He is still incarcerated, but now at Madison Correctional Institution. (*Id.* at ¶ 6, #4).

---

[1] Refers to PageID Number.

A.      **The June 4, 2017 Stabbing.**

Pugh and Lee's suit, at least as far as their joint claims, stems from an alleged stabbing that occurred while they were both incarcerated at SOCF. On June 4, 2017, Pugh and Lee were permitted to leave their respective cells for recreational time. (*Id.* at ¶¶ 15–16, #5). Before inmates are permitted out of their cells at SOCF, however, they are strip searched by corrections officers, which is the "normal procedure" at the facility. (*Id.* at ¶¶ 16–17, #5–6). Consistent with that policy, on June 4th, Pugh and Lee were strip-searched, individually walked out of their respective cells, and handcuffed to a table with two other inmates. (*Id.* at ¶¶ 18–19, #6). Pugh and Lee assert that all four men, all of whom are African American, were strip searched prior to being seated together. (*Id.* at ¶ 22). Being handcuffed to the table provided Pugh and Lee only a few inches of mobility, but it was enough room to play the card game Spades. (*Id.* at ¶¶ 20–21).

While playing cards, Pugh and Lee observed Defendant Officers Faye ("Officer Faye") and Dalton ("Officer Dalton") talking to another inmate, Gregory Reinke ("Reinke"), who was still in his cell. (*Id.* at ¶¶ 23–24). Pugh and Lee allege all three of them are "Caucasian" and that Reinke is "a known white supremacist and a member of the Aryan Brotherhood gang." (*Id.* at ¶ 25, #7). Officers Faye and Dalton subsequently removed Reinke from his cell and shackled him to the table next to the four men, but allegedly without first strip searching him. (*Id.* at ¶¶ 26–27). Pugh and Lee further allege the Officers either gave Reinke a key or that he otherwise had a device that would eventually enable him to release his restraints. (*Id.* at ¶ 27).

2

After about twenty or thirty minutes, "Reinke unlocked his handcuffs[,]" "pulled an 8-inch blade out of his sock[,]" and proceeded to stab Pugh, Lee, and one of the other men at their table. (*Id.* at ¶¶ 30–31). Pugh purports that he was stabbed "at least ten times" and Lee claims he was stabbed "at least twice." (*Id.* at ¶¶ 34–35, #8). The two further allege that Officers Dalton and Faye stood "ten feet away behind a locked door," "did not immediately respond," and "laughed." (*Id.* at ¶¶ 36–38). One of the inmates was eventually able to free himself from his handcuffs and tackle Reinke, at which point the Officers intervened, pepper-spraying that inmate but not Reinke, while the other inmates "were bleeding out." (*Id.* at ¶¶ 40–44).

Pugh and Lee allege that for "the next ten to fifteen minutes" Officers Faye and Dalton provided no first aid, but instead "stood by and watched." (*Id.* at ¶ 45). They also allege that Defendant Sergeant John Doe was present, but similarly did not provide any first aid or instruct others to do so. (*Id.* at ¶ 46, #9). In fact, they allege that Sergeant John Doe "attempted to prevent and deny … medical attention" and that the three prison officials said to each other "'we should just let them die.'" (*Id.* at ¶¶ 47–48). Nurses arrived "at least ten minutes later" and administered first aid. (*Id.* at ¶ 49). Pugh was treated outside the prison at The Ohio State University hospital; Lee was also hospitalized, but it is unclear where. (*Id.* at ¶¶ 50–51). After his release from the hospital, Pugh requested a transfer from SOCF, which was denied. (*Id.* at ¶ 52).

**B.  Pugh's June 2018 Incident In The Infirmary.**

Pugh separately alleges that in June 2018, he began experiencing chest pain and constipation, so he sought treatment from Defendant John Doe Nurses ("John Doe Nurses") at SOCF. (Compl. at ¶¶ 60–61, #10–11). After allegedly ignoring his requests, one of the John Doe Nurses took Pugh's blood pressure, conducted an EKG, and determined that "everything seemed normal and that he was fine." (*Id.* at ¶¶ 62–64, #11). Pugh reiterated his concerns, and alleges the John Doe Nurses accused of him of "faking." (*Id.* at ¶ 66). While he was seeking treatment, there were several corrections officers, the Defendant John Doe Corrections Officers ("John Doe Officers"), with Pugh and the John Doe Nurses. (*Id.* at ¶ 67). Pugh alleges that the John Doe Nurses conspired with the John Doe Officers and left the room, which afforded those officers the opportunity to assault Pugh, who was still handcuffed and shackled. (*Id.* at ¶¶ 68–72). After the assault, the John Doe Officers warned Pugh to not "fall out[,]" and left. (*Id.* at ¶¶ 73–74, #11–12). Pugh requested, but was denied, medical treatment for new injuries he allegedly suffered during that assault. (*Id.* at ¶¶ 74–75, #12). He was released from SOCF on December 27, 2018. (*Id.* at ¶ 76).

**C.  Pugh And Lee's Complaint.**

Pugh and Lee filed suit on April 3, 2019, against Officers Faye and Dalton, Sergeant John Doe, SOCF Warden Ronald Erdos ("Warden"), the John Doe Nurses, and the John Doe Officers. Together, Pugh and Lee assert six counts, all of which arise under 42 U.S.C. § 1983. Individually, Pugh asserts five more counts, all also arising under 42 U.S.C. § 1983. (The Pugh-only claims relate to the alleged incident

4

at the infirmary.). Only two of the eleven claims, though, Count I and Count XI—both of which are asserted jointly by Pugh and Lee—are of particular relevance to the pending Motion for Judgment on the Pleadings. That is because those two claims are the only ones that are asserted in whole (Count XI) or in part (Count I), against the Warden in his personal capacity.

In terms of these claims against the Warden, Pugh and Lee make several conclusory allegations in the background section of their Complaint. Specifically, they claim that Reinke was a "known threat of violence in the prison," had a history of "misconduct and violence[,]" that he was "known by Defendant Warden and the staff … to carry shanks in violation of prison rules[,]" and that he had "been caught with shanks and/or knives on at least five different occasions." (Compl. at ¶¶ 54–57, #9–10). They allege that Reinke "attempted to stab inmates on at least two other occasions prior to" this incident. (*Id.* at ¶ 57, #10). They further allege Reinke was "a threat to the safety of others" but claim the Warden "did nothing to prevent" this attack and that he "failed to train and supervise his subordinates" and "implicitly approved, authorized, or acquiesced" to unconstitutional behavior by Sergeant John Doe and Officers Dalton and Faye. (*Id.* at ¶ 58).

Based on these and other allegations, in Count I of the Complaint, Pugh and Lee allege that three Defendants—Faye, Dalton, and the Warden—violated their Eighth Amendment rights by failing to protect them from Reinke's attack. (*Id.* at ¶¶ 78–94, #12–14). Importantly, they do not allege that the Warden was present when the attack occurred, or in any way encouraged or directed the conduct of the

officers in connection with this particular event. Rather, picking up on the theme from the background allegations, they claim that the Warden knew of the risk Reinke presented, but that the Warden was deliberately indifferent to those risks. (*See* Compl. at ¶ 91, #14).

In Count XI, which is labeled "Supervisory Individual Liability" and is directed solely at the Warden, Pugh and Lee allege that the Warden "was responsible for the supervision, discipline, and control of all Southern Ohio Correctional Facility corrections officers," and that he "at least implicitly approved, authorized, or acquiesced in his/her [sic] subordinates' misconduct." (*Id.* at ¶ 184, #27). They further allege that, "[d]espite [the Warden's] knowledge of a threat to inmate safety, Defendant Warden did not train and supervise Defendant Officers on dealing with inmates who pose a threat to other inmates' safety." (*Id.* at ¶ 187). Once again, though, they do not allege that the Warden was in any way directly involved with this specific incident, other than that it followed from his alleged failure to train and supervise generally.

## PENDING MOTIONS

On August 20, 2019, the Defendants filed their Answer (Doc. 6) and on October 2, 2019, they filed a Motion for Judgment on the Pleadings. (Defs.' Mot. for J. on the Pleadings ("Defs.' Mot"), Doc. 11, #70–77). While the Defendants' Motion was pending, Pugh and Lee filed a Motion for Leave to Amend their Complaint (Pls.' Mot. For Leave to Am. Compl. ("Pls.' Mot."), Doc. 19, #119–22). Since that time, the parties have moved forward with discovery.

**A.    Motion For Judgment On The Pleadings.**

Defendants' Motion argues that Pugh and Lee have failed to state viable personal-capacity claims under 42 U.S.C. § 1983 against the Warden (either under Count I or Count XI) because there is no "respondent [sic] superior" liability under that statute. (Defs.' Mot. at #72). Pugh and Lee disagree, arguing their claims are viable because the Warden "'approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate[s].'" (Pls.' Resp. in Opp'n to Defs.' Mot. ("Pls.' Opp'n"), Doc. 13, #84 (quoting *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995))). This, they argue, is based on the fact that the Warden both failed to train and supervise corrections officers and that he knew or should have known that Reinke had a proclivity for violence and stabbing inmates, based on Reinke's prior conduct. (*Id.* at #88).

**B.    Motion For Leave To File Amended Complaint.**

On January 15, 2020, Pugh and Lee field a Motion for Leave to Amend their Complaint. (Pls.' Mot. for Leave to Am. Compl. ("Pls.' Mot"), Doc. 19, #119–22). Rather than attaching the proposed amended complaint, the Motion requested leave to file such a complaint within forty-five days from the date of that Motion, or, in other words, by Saturday, February 29, 2020. (*Id.* at #119). The Motion suggests that the sole purpose of the proposed amendment was to identify some of the John Doe defendants. (*See id.* at #122).

Defendants objected to this Motion on two grounds. First, they argued that Pugh and Lee were required to, but did not, attach to their Motion the proposed

amended complaint. (Defs.' Resp. in Opp'n to Pls.' Mot. ("Defs.' Opp'n"), Doc. 21, #164–67). Second, they claimed that it would be futile to seek to add new defendants in place of the John Doe defendants, as the time to amend their complaint in that fashion has passed, i.e., any amendment is untimely. (*See id.* at #166–67). Their argument does not appear to be addressed specifically at the alleged June 4, 2017 stabbing, but that is likely the case, for reasons discussed below. In response, Pugh and Lee agreed that they are seeking "to add new parties[,]" but argued that they should be permitted to do so because the new parties "have received satisfactory notice." (Pls.' Reply to Defs.' Opp'n, Doc. 22, #169–71).

The current procedural posture leaves the Court at somewhat of a disadvantage. Defendants have moved for a judgment on the pleadings, but Pugh and Lee have filed a motion for leave to amend their Complaint. Given the lack of an actual proposed amended complaint, though, the Court can only guess at the substance of that proposed pleading. The Court will take Pugh and Lee at their word and assumes that the proposed amendments relating to the June 4, 2017 stabbing would go only to identifying named defendants to replace the John Doe defendants, and would not change the substance of those claims. Regardless, any such amendment would not impact the two arguments that Defendants advance in their Motion. Accordingly, the Court will first consider the Defendants' challenge to the extant pleading, and then turn to the question of whether leave to amend to add new parties is appropriate.

## LAW AND ANALYSIS

### A.      Standard Of Review.

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is analyzed in the same manner as a motion to dismiss under Rule 12(b)(6). *See Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 549 (6th Cir. 2008). This means all factual allegations in the complaint are construed in a light most favorable to the plaintiff, with all their allegations accepted as true, and all reasonable inferences drawn in their favor. *See Bullington v. Bedford Cty.*, 905 F.3d 467, 469 (6th Cir. 2018). All a plaintiff need do is provide "a short and plain statement of the claim showing that the pleader is intitled to relief." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (quoting Fed. R. Civ. P. 8(a)(2)).

But that short and plain statement must offer more than mere "labels and conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "'[A] formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). There must be "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). This means a complaint must contain "either direct or inferential allegations respecting all material elements to sustain recovery under some viable legal theory." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) (quotation omitted). "Conclusory allegations or legal conclusion masquerading as factual allegations will not suffice." *Id.* (citing *Meziboy v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005)). In sum, an action will be dismissed under this standard where "there is no law to support the claims made." *Stew Farm, Ltd. v. Nat. Res. Conservation Serv.*, 967 F. Supp. 2d 1164,

1169 (S.D. Ohio 2013) (citing *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir. 1978)). The same holds where "the facts alleged are insufficient to state a claim." *Id.*

**B.    The Warden Is Entitled To Judgment On The Pleadings.**

The Warden is entitled to judgment on the pleadings as it relates to Counts I and XI of the Complaint, and will be dismissed from this action with prejudice. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Pugh and Lee cannot hold the Warden personally liable under § 1983 merely on a basis of *respondeat superior*. *See Winkler v. Madison Cty.*, 893 F.3d 877, 898 (6th Cir. 2018) (citing *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)); *see also Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691–92 (1978) (holding that *respondeat superior* liability does not exist under § 1983). Rather, individuals sued in their personal capacity under § 1983 can be held liable only for their *own* unconstitutional behavior. *See Murphy v. Grenier*, 406 F. App'x 972, 974 (6th Cir. 2011) ("Personal involvement is necessary to establish section 1983 liability.").

To hold a supervisory official personally liable under § 1983, a plaintiff must demonstrate that the official actively engaged in some unconstitutional behavior. *See id.*; *see also Iqbal*, 556 U.S. at 676 (2009) ("Because vicarious liability is inapplicable to … § 1983 suits, a plaintiff must plead that each Government-official defendant,

through the official's own individual actions, has violated the Constitution."); *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) ("Persons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior."). This means "the supervisor must have abdicated his specific job responsibility, with the '*active performance* of the supervisor's individual job function … directly resulting in the constitutional injury.'" *Winkler*, 893 F.3d at 898–99 (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (emphasis in original)). Personal involvement requires "at a minimum" that a state actor "at least implicitly authorized, approved, or knowingly acquiesced" to the underlying constitutional violation. *Graves v. Malone*, --- F. App'x ----, No. 18-2296, 2020 WL 1900458, at *5 (6th Cir. Apr. 17, 2020) (quotation omitted); *see also Wingo v. Tenn. Dep't of Corr.*, 499 F. App'x 453, 455 (6th Cir. 2012) (per curiam) ("In order to find supervisory personnel liable, a plaintiff must allege that the supervisors were somehow personally involved in the unconstitutional activity of a subordinate, or at least acquiesced in the alleged unconstitutional activity of a subordinate." (quotation and citation omitted)); *Bellamy*, 729 F.2d at 421 ("At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinate."). Similarly, a supervisor's mere failure to act is insufficient to establish supervisory liability. *See Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) ("[A] mere failure to act will not suffice to establish supervisory liability.").

Relatedly, a failure to protect claim requires Pugh and Lee to plausibly allege that the Warden "acted with 'deliberate indifference' to a substantial risk of serious harm." *Hester v. Morgan*, 52 F. App'x 220, 222 (6th Cir. 2002) (citing *Farmer v. Brennan*, 511 US. 825, 834 (1994)). "Deliberate indifference is a state of mind more blameworthy than negligence, but it entails 'something less than acts or omission for the very purpose of causing harm or with knowledge that harm would result.'" *Id.* (quoting *Farmer*, 511 U.S. at 835). The Warden "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quotation omitted).

In their Complaint, Pugh and Lee allege two personal-capacity § 1983 claims against the Warden, asserting, at various points that:

83.    … Defendant Warden … knew that Gregory Reinke was dangerous and had stabbed inmates before, yet still permitted him to be in general population during recreational time.

91.    Defendant Warden, … owed Plaintiffs a duty to act and not be deliberately indifferent to known serious risks of physical harm against inmates. His neglect to do anything to keep Gregory Reinke away from other inmates despite knowledge of several previous instances of stabbing and possession of shanks, violated Plaintiffs' constitutionally protected right to be free from bodily harm.

…

183.    At all times relevant to this complaint, Defendant Warden was a warden and supervisor acting under the color of law in his/her actions and omissions and at least implicitly approved, authorized, or acquiesced in the unconstitutional conduct exhibited by his/her subordinate defendants named herein. … Defendant Warden established policies for his/her subordinates to follow which permitted the Defendant Officers to carry out the constitutional violations described herein.

…

12

187. Despite his knowledge of a threat to inmate safety, Defendant Warden did not train and supervise Defendant Officers on dealing with inmates who pose a threat to other inmates' safety.

188. As a result of Defendant Warden's actions and inactions, he exhibited deliberate indifference to Plaintiffs' constitutional rights in violation of 42 U.S.C. § 1983 and his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

(Compl., ¶¶ 83, 91, 183, 187–88, #13–14, 26–27).

These personal-capacity claims against the Warden fail for three reasons. First, the failure-to-protect claim falters because there is no factual allegation in the Complaint that indicates the Warden was directly involved or that he implicitly encouraged, acquiesced or authorized the alleged attack. To be sure, the Complaint *says* that the Warden "implicitly approved, authorized or acquiesced in the unconstitutional conduct[.]" (*See, e.g.*, *id.* at ¶ 183, #26–27). But the Complaint fails to allege any *facts* that plausibly support that conclusion, which is not enough. *Twombly*, 550 U.S. at 570.

That is, even assuming Reinke posed a "substantial risk of serious harm" to Pugh and Lee, there are still no facts in the Complaint that plausibly alleges the Warden knew about, and then consciously disregarded, that risk. *See, e.g.*, *Hester*, 52 F. App'x at 222–23 (granting summary judgment on a failure to protect claim because "even if the living conditions [at the prison] did present a substantial risk of serious harm, [the prisoner] has not provided evidence that, when viewed in the light most favorable to him, demonstrates that [the Warden] knew of that risk").

At best, the Complaint offers a vague assertion that the Warden "knew that Gregory Reinke was dangerous and had stabbed inmates before." (Compl. at ¶ 83,

#13). That allegation alone is insufficient to state a plausible claim against the Warden for failing to protect Pugh and Lee *in this particular instance*. Pugh and Lee have thus failed to allege facts from which the Court can infer that the Warden was deliberately indifferent to the known risk of harm as it applied to them, which is necessary to state a prima-facie-failure-to-protect claim. *See Farmer*, 511 U.S. at 828. "Although the assault on the plaintiff was unfortunate, and the injuries he suffered regrettable … [d]espite precautions, it is impossible to stop all random acts of violence in the prison environment." *Hester*, 52 F. App'x at 225.

Second, while Pugh and Lee allege the Warden failed to act, this is not enough to hold him liable under § 1983. *See Peatross*, 818 F.3d at 241 ("[A] mere failure to act will not suffice to establish supervisory liability.").

Finally, the "Supervisory Individual Liability" claim (Count XI) fails because it "improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability." *Harvey v. Campbell Cty.*, 453 F. App'x 557, 563 (6th Cir. 2011) (quotation omitted) (citing *Miller v. Calhoun Cty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005)); *see also Phillips v. Roane Cty.*, 534 F.3d 531, 543, (6th Cir. 2008) (same). Cases like *Harvey* and *Phillips* make clear that:

> [a] supervisor is not [individually] liable pursuant to § 1983 for failing to train unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct."

*Phillips*, 534 F.3d at 543 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). As already noted, there are insufficient allegations on that front here.

14

Pugh and Lee seek to escape that result by pointing to *Harris v. Ervin*, No. 1:18-cv-142, 2019 WL 1317848, at *3 (S.D. Ohio Mar. 22, 2019), and *Peatross*, 818 F.3d at 242. (*See* Pls.' Opp'n at #84–88). Those cases do not help them, though. To be sure, *Harris* notes that, "[w]here an official's execution of his or her job function causes injury to the plaintiff, the official may be liable under the supervisory-liability theory." *Harris*, 2019 WL 1317848, at *3. (quotation and citation omitted). But such liability turns on a showing of a "causal connection between a defendant's wrongful conduct and the alleged violation." *Id.* (citing *Peatross*, 818 F.3d at 242).

The "causal connection" in *Harris* and *Peatross* was much different from what plaintiffs allege here. In both of those cases, the supervisor at issue had knowledge of specific prior instances of misconduct by a subordinate, the subordinate again took that same or similar action, and a constitutional violation ensued. *See id.* ("In particular, Plaintiff alleges that Erdos was on notice of the need to provide adequate medical care to inmates sprayed with chemical spray … failed to supervise and train employees charged with doing so … [and] was on notice that [the Defendant Officer] had used excessive force against inmates on multiple occasions."); *Peatross*, 818 F.3d at 243 (finding a supervisory liability claim was plausible when the supervisor was aware of fifty-four officer shootings in five years, that there was a "dire need" to review police operations, and the supervisor both did nothing and gave officers a "green light" to violate citizens' civil rights). Here, by contrast, the requisite connection is both much more attenuated and not plausibly alleged. Namely, Pugh and Lee fail to allege that the Warden was aware of any prior occasion where Officers

15

Faye or Dalton failed to prevent or encouraged inmates to stab or attack others, failed to search inmates prior to recreational time, or were impermissibly slow to respond to inmate violence, let alone that the Warden, by "execution of his job function[,]" implicitly permitted all this to occur in connection with this "specific incident of misconduct." *Phillips*, 534 F.3d at 543.

In short, there is simply no allegation that directly ties the Warden's alleged failure to train or failure to supervise to the specific incident here. This case is not one, for example, where a supervisor watched fellow guards beat a prisoner, and failed to exercise his supervisory authority to stop the attack. Nor is it even a situation where a supervisor stood silently by and watched other guards fail to step in to halt a prisoner-on-prisoner attack. Rather, the allegation is merely that the Warden generally knew of a potential risk that could potentially result in harm of some kind at some point in time, and should have done more to prevent that possible harm. That is not enough for personal liability.

Rather, failure-to-train or failure-to-supervise claims of the nature alleged here could give rise to, at most, *official-capacity* claims against the Warden, which would in turn create liability for the governmental entity, not for the supervisor himself.[2] But that approach runs headlong into two additional problems. First,

---

[2] That is not to suggest that such claims would lie here. Even official-capacity failure-to-train or failure-to-supervise claims require a showing that those failures constituted deliberate indifference to a known risk. *See, e.g.*, *Essex v. Cty. of Livingston*, 518 F. App'x 351, 355–56 (6th Cir. 2013) (comparing personal-capacity claims with official-capacity claims against a municipality and noting the latter "is a broader claim concerning the custom or policy of a municipality, and thus would implicate the conduct of a defendant supervisor insofar as he acted with deliberate indifference in his official capacity as policymaker" (citations omitted)). As discussed above, Plaintiffs are not making (and cannot make) official-capacity claims here,

Plaintiffs do not assert an official-capacity claim. To the contrary, they make it clear that they are seeking to hold the Warden "individually liable." (Compl. at ¶¶ 14, 120, #5, 19). They likely did so because of the second problem—the Warden is a state employee, and "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). In short, Count XI is fatally flawed, whether considered as a personal-capacity claim or as an official-capacity claim.

As neither Count I nor Count XI set forth viable § 1983 claims against the Warden, discussion of qualified immunity is unnecessary. Therefore, the Court **GRANTS** Defendants' Motion on this point and **DISMISSES** the claims against the Warden in Count I and Count XI **WITH PREJUDICE**.

## C. Pugh And Lee's Motion To Amend Is Granted.

While the Defendants' Motion was pending, on January 15, 2020, Pugh and Lee filed a Motion for Leave to Amend their Complaint (Pls.' Mot. at #119–22), which the Defendants opposed. (*See* Defs.' Resp. in Opp'n to Pls.' Mot. ("Defs.' Opp'n"), Doc. 21, #164–67[3]). Pugh and Lee argue that because Federal Rule of Civil Procedure 15(a)(2) provides that courts "should freely give leave" to amend pleadings, and

---

though, so the Court need not consider whether the Plaintiffs could sufficiently plead deliberate indifference.

[3] The Court does note that in their opposition, Defendants claim that "Hollis and Pascol" are "attempting to identify and add parties" or are trying to "avoid the obvious statute of limitations problem." The Court is nearly certain Defendants are referring to plaintiffs in another case also before this Court arising out of the same stabbing incident. (*See* Defs.' Opp'n at #166; *see also Hollis et al. v. Erdos, et al.*, No. 1:19-cv-436 (S.D. Ohio) (Cole, J.)). Pugh and Lee's initial Complaint in this action was filed within the two-year statutory period, so the "obvious statute of limitations problem" is not as obvious to the Court as it is to the Defendants. Regardless, the Court addresses Pugh and Lee's Motion in this Order.

because there has been no undue delay, or bad faith on their part, nor would amendment be futile, that leave is appropriate. (*See* Pls.' Mot. at #120–22).

Defendants make a number of arguments in response. They argue the motion should be denied because the failure to attach the proposed amended complaint is fatal. (Defs.' Opp'n at #165–66). They further contend that adding defendants at this point, as opposed to merely substituting mistaken parties, is barred by the applicable statute of limitations. (*See id.* at #166–67). By way of reply, Pugh and Lee argue that they described the proposed amended complaint with enough particularity, and that regardless, they are not trying to amend the claims or add facts, but are merely seeking to "add new parties who have received satisfactory notice." (Pls.' Reply to Defs.' Opp'n, Doc. 22, #170).

Deciding Pugh and Lee's Motion requires a brief discussion about the statute of limitations applicable to their claims. Of course, a prerequisite to bringing a § 1983 claim, like any other claim, is that it must be brought within the applicable statute of limitations period. And it is settled that state law governs the statute of limitations applicable to a § 1983 action, but federal law governs when that period begins to run. *Wallace v. Kato*, 549 U.S. 384, 388 (2007) ("[T]he accrual date of a § 1983 cause of action is a question of federal law that is not resolved by reference to state law.").

As to the former, "the appropriate statute of limitations for 42 U.S.C. § 1983 civil rights actions arising in Ohio is contained in Ohio Rev. Code § 2305.10, which requires that all actions for bodily injury be filed within two years after their accrual." *Browning v. Pendleton*, 869 F.2d 989, 992 (6th Cir. 1989) (en banc). And as to the

latter, under federal law, the statute of limitations period begins to run when the claim accrues, the point when the plaintiff "knows or has reason to know of the injury which is the basis of his action." *Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007) (quotation omitted); *see also Wallace*, 549 U.S. at 388 ("[I]t is the standard rule that accrual occurs when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." (quotation and citation omitted)); *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984) (citing *Keating v. Carey*, 702 F.2d 377, 382 (2d Cir. 1983)) ("The statute of limitations commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action."). "Stated differently, 'in determining when the cause of action accrues in § 1983 cases, we look to the event that should have alerted the typical lay person to protect his or her rights.'" *Cooey*, 479 F.3d at 416 (quoting *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 856 (6th Cir. 2003)).

On the facts here, there is little question that the day of the alleged attack, June 4, 2017, is the day Pugh and Lee's combined claims accrued. As for Pugh's individual claims, they similarly accrued the day of the alleged assault in the infirmary, some unspecified day in June of 2018.[4]

While the Defendants' argument, that adding defendants at this point is time-barred, is straightforward enough, there are two issues they do not address:

---

[4] There are several issues with the Defendants' argument on this point. First, they do not identify the appropriate statute of limitations for causes of action under §1983 in Ohio. Second, they do not distinguish between the two sets of claims here: Pugh and Lee levied several combined claims (against, among others, Sergeant John Doe) and Pugh made several more individual claims (against the John Doe Nurses and John Doe Officers). They occurred at different times, and thus, the day the statute of limitations will (or did) expire, is necessarily different. Defendants lump the combined and individual claims together in arguing amending the Complaint is futile.

administrative exhaustion and tolling. All the claims here are subject to the Prison Litigation Reform Act ("PLRA"), which applies to all "federal claims seeking redress for prison circumstances or occurrences[.]" *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015). The PLRA requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined to any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "This language unambiguously requires exhaustion as a mandatory threshold requirement in prison litigation." *Brown v. Morgan*, 209 F.3d 595, 596 (6th Cir. 2000). Because of this requirement, the Sixth Circuit has held that the statute of limitations applicable to a prisoner's civil rights claim is tolled while the plaintiff exhausts their administrative remedies. *See Brown*, 209 F.3d at 596 ("[T]he statute of limitations which applied to [plaintiff's] civil rights action was tolled for the period during which his available state remedies were being exhausted."); *Waters v. Evans*, 105 F. App'x 827, 828–29 (6th Cir. 2004) (same).

In making their statute of limitations argument, though, Defendants say nary a word about either exhaustion or tolling. (*See* Defs.' Resp. in Opp'n to Pls.' Mot. ("Defs.' Opp'n"), Doc 21, #166). Instead, they simply say that Pugh and Lee "make no attempt to explain how these yet-to-be-named Defendants can avoid the obvious statute-of-limitations problem." (*Id.*). In reply, Pugh and Lee choose not to address the statute of limitations issue at all. Instead, they argue that the Defendants had the means to identify Sergeant John Doe, the John Doe Nurses, and the John Doe

Officers well-before this point and because of that fact, notice should be imputed. (*See* Pls.' Reply to Defs.' Opp'n, Doc. 22, #170–71).

Both approaches miss the mark, albeit in different ways. As for Defendants, the "obvious" statute of limitations problem is a little more nuanced than they acknowledge. Defendants do not assert that Pugh and Lee failed to grieve their claims while at SOCF, nor do Defendants press a failure-to-exhaust defense, as they presumably would if Pugh and Lee had not pursued their administrative remedies, like the PLRA requires. For their part, though, Pugh and Lee did not explicitly plead that they engaged in any administrative grievance procedure at SOCF that would entitle them to tolling, nor do they raise this point in their Reply.

This leaves the Court befuddled. For Pugh and Lee's joint claims (Counts I through V and XI), the Court has no information as to what tolling, if any, may have arisen as a result of the prison's grievance process. Accordingly, the Court is unable to say when the statute of limitations ran (or, perhaps, will run). As things currently stand, then, the Court cannot determine whether Pugh and Lee's amended complaint (when accounting for tolling, if any) would be untimely at all. (Of course, even if it is, the Court would separately need to determine whether adding new defendants may relate back to the timely Complaint.) Concerned that some tolling may be appropriate (given Defendants' failure to allege an exhaustion defense), but lacking information about the magnitude of that tolling, the Court declines to rely on timeliness concerns as a basis to deny Pugh and Lee's Motion.

As for Pugh's individual claims (Counts VI through X), it is not clear, based on the Complaint, exactly when they accrued. The Complaint merely says the infirmary attack occurred in June 2018. (Compl. at ¶ 60, #10). Exactly when in June, though, is of little moment for statute of limitations purposes. Given that there is a two-year limitations period, the earliest that period could expire is June 1, 2020. Therefore, denying leave to amend those claims on statute of limitations grounds would be improper, too.

All that being said, a district court has broad authority to decide whether or not to grant a party leave to amend their pleadings. *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 330 (1971) ("It is settled that the grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court."); *see also Foman v. Davis*, 371 U.S. 178, 187 (1971) (opining that an "outright refusal to grant the leave without any justifiable reason" would likely constitute an abuse of discretion).

Accordingly, the Court grants Pugh and Lee leave to amend their Complaint to identify any and all of the John Doe defendants, but in doing so, makes two points. First, because the Court has yet to see the Amended Complaint, the Court makes no ruling on whether that filing will be timely as to any new defendants identified. Second, and relatedly, the Court advises Pugh and Lee to be mindful of the timing issues outlined above, and encourages them to consider, and address through appropriate allegations, the relevant statute of limitations issues before filing any Amended Complaint. That being said, the Court **GRANTS** Plaintiffs' Motion for

Leave to File an Amended Complaint, in which they may identify parties currently named as John Doe defendants. Any such Amended Complaint shall be filed within fourteen days from the entry of this Order.

### CONCLUSION

Based on the above, the Court **GRANTS** Defendants' Motion for Judgment on the Pleadings (Doc. 11) as it pertains to the Warden, who is **DISMISSED** from this action **WITH PREJUDICE**. Further, the Court **GRANTS** Plaintiffs' Motion for Leave to File an Amended Complaint (Doc. 19) and instructs them to do so within fourteen days from the entry of this Order.

**SO ORDERED.**

May 12, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**